UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAND WHEATLAND,

             *Plaintiff*,

   v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

             *Defendant*.

Civil Action No. 21-3126 (CJN)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

STATEMENT OF FACTS ..................................................................................................... 1

    A.  The COVID-19 Treatment Guidelines Panel ............................................................ 1

    B.  Wheatland's FOIA Request .................................................................................... 3

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.     Summary Judgment is Proper As to Those Records the Department Has Produced .......... 5

II.    The Department Conducted An Adequate Search For Responsive Records ..................... 6

III.   The Department Properly Withheld Records Under Exemptions 5 Based On the
Deliberative Process Privilege ....................................................................................... 9

    A.  The Panel's Minutes Are Pre-Decisional and Deliberative ....................................... 11

    B.  The Panel's Minutes are "Intra-Agency" Records .................................................... 12

IV.   Production Would Harm Interests That the Deliberative Process Privilege Protects ....... 15

    A.  Production of the Minutes Would Chill Panel Members' Candor Due to a Fear of
Being Subject to Threats, Harassment, and Conspiracy Theories ............................. 16

    B.  Production of the Minutes Would Enable Those Who Spread COVID-19-Related
Misinformation to Misrepresent and Distort the Panel's Guidance ........................... 19

V.    The Department Produced All Reasonably Segregable, Non-Exempt Information ......... 21

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*,
   Civ. A. No. 21-1364 (TNM), 2021 WL 5231939 (D.D.C. Nov. 10, 2021) .............................. 8

*Am. Petro. Tankers Parent, LLC v. United States*,
   952 F. Supp. 2d 252 (D.D.C. 2013) ....................................................................................... 14

*Amiri v. Nat'l Sci. Found.*,
   Civ. A. No. 20-02006 (TNM), 2021 WL 4438910 (D.D.C. Sept. 28, 2021)........................... 21

*Ancient Coin Collectors Guild v. United States*,
   641 F.3d 504 (D.C. Cir. 2011) ............................................................................................... 13

*Baker Hostetler LLP v. Dep't of Com.*,
   473 F.3d 312 (D.C. Cir. 2006) ............................................................................................... 12

*CNN, Inc. v. FBI*,
   271 F. Supp. 3d 108 (D.D.C. 2017) ......................................................................................... 8

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ............................................................................................... 19

*Ctr. for Pub. Integrity v. Dep't of Def.*,
   486 F. Supp. 3d 317 (D.D.C. 2020) ....................................................................................... 21

*Dale v. IRS*,
   238 F. Supp. 2d 99 (D.D.C. 2002) ........................................................................................... 8

*DiBacco v. U.S. Army*,
   795 F.3d 178 (D.C. Cir. 2015) ................................................................................................. 6

*Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*,
   892 F. Supp. 2d 28 (D.D.C. 2012) ......................................................................................... 11

*Evans v. Fed. Bureau of Prisons*,
   951 F.3d 578 (D.C. Cir. 2020) ........................................................................................... 4, 21

*Fonda v. CIA*,
   434 F. Supp. 498 (D.D.C. 1977) .............................................................................................. 9

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2356 (2019) ........................................................................................................... 10

**Cases (cont.)**

*Formaldehyde Inst. v. Dep't of Health & Human Servs.*,
  889 F.2d 1118 (D.C. Cir. 1989) ............................................................ 14, 15, 19

*Freedom Watch, Inc. v. Dep't of State*,
  925 F. Supp. 2d 55 (D.D.C. 2013) ......................................................... 8

*Hodge v. FBI*,
  703 F.3d 575 (D.C. Cir. 2013) ............................................................... 6

*Iturralde v. Comptroller of the Currency*,
  315 F.3d 311 (D.C. Cir. 2003) ............................................................... 6

*James Madison Project v. CIA*,
  Civ. A. No. 08-1323, 2009 WL 2777961 (E.D. Va. Aug. 31, 2009) .......... 8

*Jordan v. Dep't of Justice*,
  591 F.2d 753 (D.C. Cir. 1978) ............................................................... 19

*Jud. Watch, Inc. v. Dep't of Com.*,
  583 F.3d 871 (D.C. Cir. 2009) ............................................................... 11

*Jud. Watch, Inc. v. Dep't of Treasury*,
  796 F. Supp. 2d 13 (D.D.C. 2011) ......................................................... 12

*Larson v. Dep't of State*,
  565 F.3d 857 (D.C. Cir. 2009) ............................................................... 6

*Latham v. Dep't of Just.*,
  658 F. Supp. 2d 155 (D.D.C. 2009) ....................................................... 8

*Leopold v. CIA*,
  177 F. Supp. 3d 479 (D.D.C. 2016) ....................................................... 7

*Machado Amadis v. Dep't of State*,
  971 F.3d 364 (D.C. Cir. 2020) ............................................................ 10, 19

*Mapother v. Dep't of Just.*,
  3 F.3d 1533 (D.C. Cir. 1993) ................................................................. 13

*Mason v. Callaway*,
  554 F.2d 129 (4th Cir. 1977) ................................................................. 8

*Maynard v. CIA*,
  986 F.2d 547 (1st Cir. 1993) .................................................................. 6

**Cases (cont.)**

*McGehee v. CIA,*
   697 F.2d 1095 (D.C. Cir. 1983) ............................................................................. 5

*McKinley v. Bd. of Governors of Fed. Rsrv. Sys.,*
   647 F.3d 331 (D.C. Cir. 2011) ............................................................................. 14

*Mead Data Cent., Inc. v. Dep't of Air Force,*
   566 F.2d 242 (D.C. Cir. 1977) ............................................................................. 13

*Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Just.,*
   844 F.3d 246 (D.C. Cir. 2016) ....................................................................... 21, 22

*Nat'l Inst. of Mil. Justice v. Dep't of Def.,*
   512 F.3d 677 (D.C. Cir. 2008) ............................................................................. 14

*Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. Dep't of Labor,*
   828 F. Supp. 2d 183 (D.D.C. 2011) ..................................................................... 12

*Oglesby v. Dep't of Army,*
   920 F.2d 57 (D.C. Cir. 1990) ................................................................................. 6

*People for the Ethical Treatment of Animals v. Dep't of Health & Human Servs.,*
   901 F.3d 343 (D.C. Cir. 2018) ............................................................................. 10

*Petro. Inf. Corp. v. Dep't of Interior,*
   976 F.2d 1429 (D.C. Cir. 1992) ............................................................... 10, 13, 19

*Porup v. CIA,*
   997 F.3d 1224 (D.C. Cir. 2021) ........................................................................... 22

*Pub. Emps. for Env't Resp. v. Dep't of Homeland Sec.,*
   Civ. A. No. 18-0158 (CKK), 2021 WL 5987008 (D.D.C. Dec. 17, 2021) ............ 21

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico,*
   740 F.3d 195 (D.C. Cir. 2014) ............................................................................. 13

*Reporters Comm. for Freedom of Press v. FBI,*
   3 F.4th 350 (D.C. Cir. 2021) ............................................. 9, 10, 11, 15, 18, 19

*Reps. Comm. for Freedom of the Press v. Customs & Border Prot.,*
   Civ. A. No. 18-0155 (TNM), 2021 WL 4843970 (D.D.C. Oct. 18, 2021) .............. 18

*Sack v. CIA,*
   53 F. Supp. 3d 154 (D.D.C. 2014) ......................................................................... 8

**Cases (cont.)**

*SafeCard Servs., Inc. v. SEC,*
   926 F.2d 1197 (D.C. Cir. 1991) ............................................................ 6, 11

*Shapiro v. CIA,*
   170 F. Supp. 3d 147 (D.D.C. 2016) ............................................................ 8

*Students Against Genocide v. Dept. of State,*
   257 F.3d 828 (D.C. Cir. 2001) ............................................................ 5

*Touarsi v. Dep't of Just.,*
   78 F. Supp. 3d 332 (D.D.C. 2015) ............................................................ 12

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.,*
   141 S. Ct. 777 (2021) ............................................................ 9

*Weisberg v. Dep't of Justice,*
   627 F.2d 365 (D.C. Cir. 1980) ............................................................ 5

*Wren v. Dep't of Just.,*
   282 F. Supp. 3d 216 (D.D.C. 2017) ............................................................ 7

**Statutes**

5 U.S.C. § 552 ............................................................ 1

5 U.S.C. § 552(a)(8)(A)(i)(I) ............................................................ 15

5 U.S.C. § 552(a)(8)(A)(ii)(I) ............................................................ 21

5 U.S.C. § 552(b) ............................................................ 21

5 U.S.C. § 552(b)(5) ............................................................ 9

**Other Authorities**

Justin Ling, *False Claims of U.S. Biowarfare Labs in Ukraine Grip QAnon,*
   Foreign Policy (Mar. 2, 2022) ............................................................ 17

Peter Yim, *NIH, FDA and CDC betrayed the country: The sophisticated campaign
   of disinformation against the American people,* Substack (Jan. 17, 2022) ............................................................ 17

**Rules**

Fed. R. Civ. P. 56(a). ............................................................ 4

The Department of Health and Human Services respectfully files this memorandum of points and authorities in support of its motion for summary judgment. Rand Wheatland submitted a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for records from 2020 and 2021 related to transcripts, minutes and recordings of the meeting of the National Institutes of Health ("NIH") COVID-19 Treatment Guidelines Panel. The Department conducted a search for responsive records and withheld them in part under Exemption 5 based on the deliberative process privilege. The records at issue reflect the Panel's deliberations over proposed Guidelines updates, and their disclosure would chill Panel members from offering their candid thoughts on the optimal treatment and management of COVID-19 and contribute to the spread of COVID-19-related misinformation. This Court thus should grant the Department summary judgment.

## STATEMENT OF FACTS

### A.    The COVID-19 Treatment Guidelines Panel

NIH promulgated the COVID-19 Treatment Guidelines to provide health care providers, patients, and policy experts the most up to date information concerning the optimal treatment and management of COVID-19. Decl. of Gorka Garcia-Malene ¶ 3. Due to the rapid pace of developments in scientific understanding of COVID-19 and how best to treat and manage it, NIH updates the Guidelines frequently as new scientific data becomes available. *Id.* The medical community relies on the Guidelines to set COVID-19 treatment and management regiments. *Id.* The Guidelines can be found at https://www.covid19treatmentguidelines.nih.gov/.

NIH has appointed the COVID-19 Treatment Guidelines Panel, a panel of experienced public health experts from federal agencies, health care and academic organizations, and professional societies, to develop the Guidelines. Garcia-Malene Decl. ¶ 4. Panel members are selected based on their clinical experience and expertise in patient management, translational and

clinical science, and/or development of treatment guidelines. *Id.* Each section of the Guidelines is developed by a working group of Panel members with expertise in the area their section addresses. *Id.* Each working group is responsible for identifying and conducting a systematic, comprehensive review of relevant scientific research, data, and literature, then synthesizing that data to develop recommendations. *Id.* Each working group proposes updates based on the latest published research and available clinical information concerning COVID-19. *Id.* A full roster of panel members can be found at https://www.covid19treatmentguidelines.nih.gov/about-the-guidelines/panel-roster/.

Voting Panel members review and vote on proposed updates to the Guidelines. Garcia-Malene Decl. ¶ 5. Proposed updates generally amount to recommendations in favor of or against a treatment, or statements that no recommendation can be made given the insufficiency of evidence on a treatment. *Id.* A majority of Panel members must support a proposed recommendation for it to be incorporated into the Guidelines. *Id.* In this way, all Guidelines recommendations are thoroughly vetted before they are adopted to ensure the public receives the best possible advice concerning the optimal management and treatment of COVID-19. *Id.* Once the Panel adopts an update, NIH incorporates it into the Guidelines and publishes it on the Guidelines website. *Id.*

During Panel meetings, Panel members share thoughts, opinions, and recommendations concerning proposed Guideline updates. Garcia-Malene Decl. ¶ 6. They discuss whether proposed Guidelines updates merit adoption, and how updates should be written to maximize clarity and avoid unnecessary and potentially harmful confusion. *Id.* They frequently expressed their thoughts in preliminary form, revising and changing their thoughts as deliberations progress in response to their fellow Panel members' comments. *Id.* The Panel's internal discussions are an important aspect of the process by which NIH formulates the Guidelines. Garcia-Malene Decl. ¶ 7. These discussions ensure that the scientific information and analysis underlying proposed Guidelines

updates is subject to careful scrutiny by experts and determined to be reliable. *Id.* When Panel members offer differing perspectives on a proposed Guidelines update, the ensuing dialogue ensures that their perspectives are fulsomely ventilated, so that the Panel can determine which position is more compelling. *Id.* This enables NIH to update the Guidelines based on the most sound scientific analysis available. *Id.* To protect the integrity of this process, Panel members are required to keep confidential any discussions that occur during Panel meetings. *Id.*

The Panel's Executive Secretary is Dr. Alice K. Pau, PharmD, a Staff Scientist and Clinical Pharmacist at the National Institute of Allergy and Infectious Diseases ("NIAID") a subsidiary agency within NIH. Garcia-Malene Decl. ¶ 8. Dr. Pau serves as the Panel's Executive Secretary in the course of her duties as a Department employee. *Id.* In this role, she takes minutes for each Panel meeting and stores them in her files within NIH's file system. *Id.* The minutes reflect her subjective assessments as to which aspects of the Panel's deliberations she considered to be most important to the Guidelines' formulation. *Id.* NIH expected the Panel to keep minutes of its meetings, and intended that those minutes would remain confidential. *Id.*

Panel members are expected to offer their thoughts and opinions on proposed Guidelines updates based solely on their impartial expertise and consideration of public health. Garcia-Malene Decl. ¶ 9. They are expected not to act as advocates for, or in a manner that aims to benefit, any specific private interest. *Id.* Panel members are expected to recuse themselves from matters where they may have a conflict of interest, and the Panel publishes a list disclosing those companies related to COVID-19 diagnostics or treatment with whom Panel members have a relationship. *Id.*

**B.    Wheatland's FOIA Request**

On January 21, 2021, Wheatland submitted a FOIA request for records "related to transcripts, minutes, and recordings of the meetings of the [NIH] COVID-19 Treatment Guidelines

3

Panel from 2020 and 2021." Statement of Undisputed Material Facts ("SUMF") ¶ 1. On February 11, 2021, the Department sent Wheatland an acknowledgment of his FOIA request and assigned it a tracking number of NIH FOIA Case No. 55825. SUMF ¶ 2. On March 5, 2021, the Department issued a final response to Wheatland's request, withholding all responsive records in their entirety. SUMF ¶ 3. On March 29, 2021, Wheatland timely filed an administrative appeal of the Department's response to its FOIA request. SUMF ¶ 4.

On March 31, 2022, the Department produced to Wheatland 158 pages of minutes of the Guidelines Panel's minutes with redactions. SUMF ¶ 5. The unredacted portions of these records fall into four categories: (1) the header for each document, which includes the meeting's date and time; (2) a list of attendees and non-attendees at each meeting, which includes Panel members, community members, representatives of professional organizations, ex-officio members, other guests, and support staff, as well as their institutional affiliations, if any; (3) portions of the minutes in which the Panel discussed matters not directly related to proposed Guidelines updates; and (4) concluding remarks for each meeting. SUMF ¶ 6. The redacted parts of the records pertain to Panel deliberations over proposed Guidelines updates and the scientific data, analysis, and ideas underlying them. SUMF ¶ 7.

## LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The vast majority of FOIA cases can be resolved on summary judgment." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) (cleaned up). An agency is entitled to summary judgment in a FOIA case if it shows that no material facts are disputed, it conducted an adequate search for responsive records, and each responsive record that it has found either has been produced or is exempt from

disclosure. *See Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980). The agency may

rely on reasonably detailed, non-conclusory declarations to meet this burden. *See McGehee v. CIA*,

697 F.2d 1095, 1102 (D.C. Cir. 1983).

**ARGUMENT**

The Department conducted an adequate search for records responsive to Wheatland's

request and produced 158 pages, with redactions. The redacted parts of these records concern the

Panel's deliberations over proposed Guidelines updates, which fall squarely within the deliberative

process privilege's scope. The fact that the Panel is neither an agency nor part of the Department

is immaterial, as the records are "intra-agency" in character under the consultant corollary doctrine.

Their disclosure would harm the Department in two ways: by (1) chilling Panel members from

offering their candid thoughts on proposed Guidelines updates, and (2) facilitating the spread of

COVID-19-related misinformation. Finally, the Department produced all non-exempt, reasonably

segregable parts of these records. This Court thus should grant the Department summary judgment.

## I.    Summary Judgment is Proper As to Those Records the Department Has Produced

An agency is entitled to summary judgment as to any record or part thereof that already

"has been produced." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir.

2001) (quotation marks omitted). The Department has produced 158 pages of records, with some

redactions, to Wheatland. SUMF ¶¶ 5-6. The unredacted parts of these records consist of headers;

lists of attendees and non-attendees at Panel meetings, including their institutional affiliations, if

any; discussions of matters not directly related to proposed Guidelines updates; and concluding

remarks for each meeting. SUMF ¶ 6. Summary judgment is warranted as to these portions of the

records. *See Students Against Genocide*, 257 F.3d at 833.

## II.    The Department Conducted An Adequate Search For Responsive Records

An agency must conduct an adequate search in response to a proper FOIA request. *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009). It "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). A reasonable search is one that covers those locations where responsive records are likely to be located. *Id.* A search is inadequate only if the agency fails to "show, with reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents." *Id.* "A search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." *DiBacco v. U.S. Army*, 795 F.3d 178, 194-95 (D.C. Cir. 2015) (cleaned up). In other words, "the adequacy of a search is determined not by the fruits of the search, but by the appropriateness of its methods." *Hodge v. FBI*, 703 F.3d 575, 579 (D.C. Cir. 2013) (cleaned up). A search is not inadequate merely because it failed to "uncove[r] every document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

The agency bears the burden to demonstrate the adequacy of its search by providing a declaration setting forth the type of search performed and averring that all files likely to contain responsive materials were searched. *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003). Such declarations "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs.*, 926 F.2d at 1200 (quotation marks omitted). Once an agency meets its burden to demonstrate the adequacy of its search, its position can be rebutted "only by showing that the agency's search was not made in good faith." *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir.

1993). Speculative or hypothetical assertions are insufficient to raise a material question of fact as to the search's adequacy. *Oglesby*, 920 F.2d at 67 n.13.

On January 29, 2021, Wheatland submitted a FOIA request seeking all transcripts, minutes, and recordings of all meetings of NIH's COVID-19 Treatment Guidelines Panel from 2020 and 2021. Garcia-Malene Decl. ¶ 11. That same day, the NIH employee who serves as the Panel's Executive Secretary in the course of her official duties searched the file where she saves minutes of Panel meetings. Garcia-Malene Decl. ¶ 11. This search turned up 158 pages of minutes from each of the Panel's 41 meetings during the relevant time period. *Id.* Each responsive record was titled "meeting notes." *Id.* The Executive Secretary knew where the meeting minutes would be saved, because she is the one who both created and stored the minutes. *Id.* She also confirmed that no recordings or transcripts of the Panel's meetings were ever created. *Id.* Given her role on the Panel, that is something she was in a position to know. *Id.* No additional searching was needed, as she knew that there were no other places where minutes of the Panel's meetings would be. *Id.*

The Executive Secretary's search of the files in which she saved the Panel meeting minutes that she herself had created was reasonably expected to produce responsive records and covered those locations where such records were likely to be located. *See Wren v. Dep't of Just.*, 282 F. Supp. 3d 216, 224 (D.D.C. 2017) ("[T]he agency's search—asking a person with personal knowledge and experience with the agency's recordkeeping where records might be found . . . satisfies the agency's obligations under FOIA to conduct an adequate search."); *Leopold v. CIA*, 177 F. Supp. 3d 479, 495 (D.D.C. 2016) (agency "did precisely what a responsible agency should do when faced with this type of FOIA request, which is to first consult with Agency officials knowledgeable about the subject matter to ascertain the universe of responsive records and to identify the specific offices and individuals who would possess those documents." (cleaned up)).

Finally, to the extent that Wheatland's request seeks not only any transcripts, minutes, and recordings of Panel meetings but also any other records "related to" such materials, it failed to "reasonably describ[e] such records," 5 U.S.C. § 552(a)(3)(A), and the Department thus was not obliged to conduct a search for them. *See, e.g.*, *CNN, Inc. v. FBI*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) ("[T]he language 'relate in any way to' certain [records] was too vague."); *Shapiro v. CIA*, 170 F. Supp. 3d 147, 155 (D.D.C. 2016) ("[T]here is a difference in kind between requests for documents that 'mention' or 'reference' a specified person or topic and those seeking records 'pertaining to,' 'relating to,' or 'concerning' the same."); *Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013) (request for records "related to" a topic was "inevitably subject to criticism as overbroad since life, like law, is a seamless web, and all documents relate to all others in some remote fashion" (cleaned up); *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (request for records "that refer or relate in any way to" topic did "not describe the records sought with reasonably sufficient detail" (quotation marks omitted)); *James Madison Project v. CIA*, Civ. A. No. 08-1323, 2009 WL 2777961, at *4 (E.D. Va. Aug. 31, 2009) (terms pertaining to" and "relating to" "generally indicat[e] an overbroad request"); *see also Mason v. Callaway*, 554 F.2d 129, 131 (4th Cir. 1977) (request for records "pertaining to" a certain topic "typifies the lack of specificity that Congress sought to preclude in the requirement . . . that records sought be reasonably described"); *Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*, Civ. A. No. 21-1364 (TNM), 2021 WL 5231939, at *5 (D.D.C. Nov. 10, 2021) (request for records "referencing or regarding" certain topics failed to reasonably describe records sought); *Sack v. CIA*, 53 F. Supp. 3d 154, 164-65 (D.D.C. 2014) (term "pertain" "is difficult to define because a record may pertain to something without specifically mentioning it. . . . Indeed, any document related to a closed investigation may arguably pertain, at least in part, to a subsequently generated list of

investigations." (cleaned up)); *Latham v. Dep't of Just.*, 658 F. Supp. 2d 155, 161 (D.D.C. 2009) (request for records "that pertain in any form or sort to" a given topic "is overly broad, and to require the [agency] to process it would be overly burdensome"); *Fonda v. CIA*, 434 F. Supp. 498, 501 (D.D.C. 1977) ("Plaintiff offers no criterion by which defendants can determine which documents 'concern her.'").

As such, this Court should grant the Department summary judgment as to the adequacy of its search.

## III.    The Department Properly Withheld Records Under Exemptions 5 Based On the Deliberative Process Privilege

Exemption 5 shields "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). It thus protects records that are subject to the deliberative process privilege—records "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 357 (D.C. Cir. 2021) (quotation marks omitted). To fall within the deliberative process's scope, a record must be "both predecisional and deliberative." *Id.* at 362. A record "is predecisional if it was generated before the agency's final decision on the matter," and "deliberative when it is prepared to help the agency formulate its position, and it reflects the give-and-take of the consultative process." *Id.* (cleaned up). "There is considerable overlap between these two prongs because a document cannot be deliberative unless it is predecisional." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021).

The deliberative process privilege serves important values. It (1) "assures agency staff that they can provide their candid opinions and recommendations to decisionmakers without fear of ridicule or reprisal," (2) "protects policymakers from premature disclosure of their proposals

before they have been completed or adopted," and (3) "guards against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Reporters Comm.*, 3 F.4th at 361 (quotation marks omitted). Ultimately, it "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, as well as an understanding that employees would be chilled from such rigorous deliberation if they feared it might become public." *Id.* at 362 (quotation marks omitted). "[E]xperience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances to the detriment of the decisionmaking process." *Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (quotation marks omitted).

Court must give FOIA's exemptions "a fair reading," rather than a narrow one. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019). That is because the exemptions serve "important interests," and "are as much a part of FOIA's purposes and policies as the statute's disclosure requirement" itself. *Id.* (cleaned up). An agency bears the burden to show that a record fits within an exemption. *Petro. Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992). It "can meet this burden through affidavits or declarations that describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *People for the Ethical Treatment of Animals v. Dep't of Health & Human Servs.*, 901 F.3d 343, 349 (D.C. Cir. 2018) (quotation marks omitted).

Exemption 5 and the deliberative process privilege protect minutes of the Panel's meetings concerning the Panel's deliberations over proposed Guidelines updates because these deliberations are an integral part of the process by which NIH formulates the Guidelines. The fact that the Panel

is not part of NIH or the Department is immaterial, because an NIH employee created and stored its minutes, and because the Panel advised NIH in the capacity of a disinterested expert consultant.

A.    **The Panel's Minutes Are Pre-Decisional and Deliberative**

An agency meets its burden to show that "the minutes of [an agency] meeting" fall within the deliberative process privilege's scope when it describes "enough about [the minutes'] context, *viz.* the agency's decisionmaking process, to establish that [they are] a pre-decisional part thereof." *SafeCard Servs.*, 926 F.2d at 1204. "Specifically, the court needs to know whether the [minutes] explai[n], directly or by reference, the reason for the agency's decision." *Id.* Minutes of the Panel's meetings concerning the Panel's deliberations over proposed Guidelines updates fall well within the privilege's scope. The Panel's sole purpose is to propose and adopt NIH's COVID-19 Treatment Guidelines. Garcia-Malene Decl. ¶ 4. Its deliberations are an important part of the process by which NIH formulates the Guidelines because they ensure that scientific information and analysis underlying proposed updates is subject to scrutiny by knowledgeable experts and found to be reliable. Garcia-Malene Decl. ¶ 7. When Panel members offer differing perspectives on a proposed update, the ensuing dialogue ensues their perspectives are fulsomely ventilated so the Panel can determine which is more compelling. *Id.* This enables NIH to update the Guidelines based on the most-sound scientific information and analysis available. *Id.*

In short, the Panel's deliberations over proposed Guidelines updates occur "before [NIH's] final decision[s] on the" Guidelines' contents, "help [NIH] formulate" what the Guidelines should say, and "reflect[t] the give-and-take of the consultative process"—exactly what the deliberative process privilege is designed to protect. *Reps. Comm.*, 3 F.4th at 362; *see also, e.g.*, *Jud. Watch, Inc. v. Dep't of Com.*, 583 F.3d 871, 874 (D.C. Cir. 2009) (recognizing that the "minutes for advisory committee meetings" fall within deliberative process privilege's scope); *Elec. Priv. Info.*

*Ctr. v. Dep't of Homeland Sec.*, 892 F. Supp. 2d 28, 47 (D.D.C. 2012) (deliberative process privilege protected minutes of meetings that reflect "the policy making process"); *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. Dep't of Labor*, 828 F. Supp. 2d 183, 190 (D.D.C. 2011) ("[M]eeting minutes relating to various rulemakings . . . . reflected deliberations between managers regarding possible courses of action, and therefore were properly redacted" (cleaned up)); *Jud. Watch, Inc. v. Dep't of Treasury*, 796 F. Supp. 2d 13, 28 (D.D.C. 2011) ("The sections of the minutes that summarize the discussions at the meetings were properly withheld. The defendant has made clear that the meetings consisted of deliberations . . . .").

### B.    The Panel's Minutes are "Intra-Agency" Records

Nor does the fact that the Panel is not part of NIH or the Department undermine the meeting minutes' status as "intra-agency" records. The minutes are "intra-agency" in character for two reasons—they are the deliberative notes of an NIH employee who took them in her capacity as such, and the Panel operated as an impartial expert advisor to NIH in developing the Guidelines.

### 1.    *The meeting minutes are privileged as an NIH employee's deliberative notes*

The minutes fall within the privilege's scope as an NIH official's notes. An NIH employee served as the Panel's Executive Secretary in the course of her official duties, took minutes for each meeting, and stored them in NIH's file system. Garcia-Malene Decl. ¶ 8; *Baker Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 321 (D.C. Cir. 2006) ("[N]otes taken by government officials often fall within the deliberative process privilege. Notes generally are selective and deliberative—and routine public disclosure of meeting notes and other notes would hinder government officials from debating issues internally, deter them from giving candid advice, and lower the overall quality of the government decisionmaking process." (citation omitted)); *Touarsi v. Dep't of Just.*, 78 F. Supp.

3d 332, 346 (D.D.C. 2015) ("An individual government officer's notes may constitute deliberative documents if they are used to assist the decisionmaking process.").

The minutes reflect the Executive Secretary's subjective assessments as to which aspects of the Panel's deliberations she considered most important to NIH's issuance of the Guidelines. Garcia-Malene Decl. ¶ 8; *Ancient Coin Collectors Guild v. United States*, 641 F.3d 504, 513 (D.C. Cir. 2011) (privilege covers "factual material assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action . . . as to  what issues are most relevant to the pre-decisional findings and recommendations" (cleaned up); *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) ("[S]election of the facts thought to be relevant clearly involves the formulation or exercise of policy-oriented *judgment* or the process by which *policy* is formulated" (cleaned up; emphasis in original)); *Petro. Inf. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) ("[M]aterials embodying officials' opinions are ordinarily exempt"); *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977) ("[T]he disclosure of even purely factual material may so expose the deliberative process within an agency [to be] exempted"). The minutes thus fall within the privilege's scope as notes of the NIH official who took them.

### 2.  The meeting minutes are privileged under the consultant corollary doctrine

The meeting minutes are also privileged under the "consultant corollary" doctrine. Under this doctrine, the D.C. Circuit "interpret[s] the phrase 'intra-agency' in Exemption 5 to go beyond the text and include U.S. agency records authored by non-agency entities if those records were solicited by a U.S. agency in the course of its deliberative process." *Pub. Emps. for Env't Resp. ("PEER") v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 201 (D.C. Cir. 2014). The doctrine recognizes that "[i]n the course of its day-to-day activities, an

agency often needs to rely on the opinions and recommendations of temporary consultants, as well as its own employees" and that "efficient government operation requires open discussions among all government policy-makers and advisors, whether those giving advice are officially part of the agency or are solicited to give advice only for specific projects." *Nat'l Inst. of Mil. Justice v. Dep't of Def.*, 512 F.3d 677, 680 (D.C. Cir. 2008) (citation omitted); *see also McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) (communications between Federal Reserve and bank were "intra-agency" because Federal Reserve "sought information from the [bank] about the financial condition and exposures of institutions monitored by the [bank]").

The Panel's meeting minutes are "intra-agency" records under the consultant corollary doctrine. They were solicited by NIH, in the sense that NIH created the Panel in the first place for the purpose of developing the Guidelines, expected the Panel to keep minutes of its meetings, and intended that those minutes would remain confidential. Garcia-Malene Decl. ¶¶ 4, 8; *accord Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1124 (D.C. Cir. 1989) (records were "submitted," within the privilege's meaning, where the agency's receipt of them was "an expected result" of the agency's behavior and the records were "expected to be confidential"). The Panel's minutes were created by an NIH employee who served as its Executive Secretary in the course of her official duties, and she stored them in an NIH file system. Garcia-Malene Decl. ¶ 8. And the Panel's deliberations were an integral part of the process by which NIH issued the Guidelines. In creating the Panel, NIH "rel[ied] on the opinions and recommendations of temporary consultants" with relevant expertise to ensure that the Guidelines reflected the most current and accurate COVID-19-related scientific information and analysis. *Nat'l Inst. of Mil. Just.*, 512 F.3d at 680 (citation omitted); *see also Am. Petro. Tankers Parent, LLC v. United States*,

952 F. Supp. 2d 252, 266 (D.D.C. 2013) ("Recommendations from consulting bodies may also fall within the scope of the deliberative process privilege.").

*Formaldehyde Institute* is on point. An agency researcher, in the course of his official duties, submitted a scientific report on formaldehyde's harmful effects on certain workers for publication in a medical journal. 889 F.2d at 1120. The journal sent the report to a panel of referees for review and, based on their reviews, declined to publish the report. *Id.* The journal then sent the researcher and agency a letter containing the referees' reviews. *Id.* A nonprofit organization sought the letter via a FOIA request, and the agency withheld it under Exemption 5 based on the deliberative process privilege. *Id.* The D.C. Circuit held that the privilege shielded the letter even though the agency did not create it, "because the agency secured review commentary in order to make" the "decision whether and in what form to publish the [r]eport." *Id.* As in *Formaldehyde Institute*, the agency enlisted specialized outside experts for assistance in deciding the contents of medical guidance that it sought to provide to the public. Just as Exemption 5 protected the letter even though outside scientific experts had submitted it to the agency, it likewise protects the parts of the meeting minutes concerning the Panel's deliberations over proposed Guidelines updates.

For these reasons, Exemption 5 and the deliberative process privilege shield the parts of the meeting minutes concerning the Panel's deliberations over proposed Guidelines updates

## IV.    Production Would Harm Interests That the Deliberative Process Privilege Protects

An agency may withhold records only if it "reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm.*, 3 F.4th at 369-70. This requires the agency to supply "a

15

focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward. Naturally, this inquiry is context specific." *Id.* at 370. Release of the Panel's meeting minutes would cause foreseeable harm in two ways. First, it would chill Panel members from offering their candid views on proposed Guidelines updates due to fear of being subject to threats, harassment, and conspiracy theories. Second, it would facilitate the spread of COVID-19-related misinformation by enabling dissemblers to distort and misrepresent the Panel's recommendations on COVID-19 treatment and maintenance.

### A. Production of the Minutes Would Chill Panel Members' Candor Due to a Fear of Being Subject to Threats, Harassment, and Conspiracy Theories

Since the COVID-19 pandemic began, Department employees, and especially those at NIH, have frequently been targets of harassment and threats by members of the public upset over aspects of the government's response to the pandemic, including threats of bodily harm and death. Garcia-Malene Decl. ¶ 15. Department components have also frequently been the targets of conspiracy theories, often phrased in extremely hostile terms that reasonably could be understood to call for harassment of Department-affiliated individuals. *Id.* A full cataloging of such harassment, threats, and conspiracy theories would be impossible to provide, but a few representative examples may be illustrative.

Dr. Anthony Fauci, NIAID's Director and one of the most prominent public health officials involved in the government's COVID-19 response, has received threats of death and bodily harm on a near-daily basis since the pandemic began. Garcia-Malene Decl. ¶ 16. The Department's enclosed declaration details just some of the many threatening and harassing messages he received in a single three-day period. *Id.* While Dr. Fauci's prominence has resulted in a higher volume of threats and harassment directed his way than most Department officials experience, others

associated with the Department, especially those who work at NIH, the Centers for Disease Control ("CDC"), or the Food and Drug Administration ("FDA") have frequently been targets of similar behavior. Garcia-Malene Decl. ¶ 17. Individual Panel members likewise have received harassing messages and threats pertaining to their participation in NIH's efforts to combat COVID-19. *Id.*

Beyond outright threats of death or bodily harm, the Department and its components have also frequently been targets of hostile conspiracy theories. For example, on January 17, 2022, a user of the blogging platform Substack named Peter Yim, who styles himself a commentator "on COVID-19 science and policy" and claims to have held a research appointment at NIH, published a post titled "NIH, FDA and CDC betrayed the country: The sophisticated campaign of disinformation against the American people." Yim described these agencies as "a public menace" that "have betrayed their country," "conducted campaigns of disinformation against the people," and committed "a crime against humanity."[1] Garcia-Malene Decl. ¶ 18. One reader commented, "It can even be said NIH, FDA and CDC betrayed the humanity." *Id.* Such overtly menacing sentiments make it reasonably foreseeable that Panel members would refrain from speaking with full candor if they knew that the minutes of their deliberations could soon be made public. *Id.*

Other conspiracy theories involving the Department's role in combatting COVID-19 are even more extravagant, but no less insidious. Just last month, for example, it was reported that "[p]ro-Russian channels and QAnon conspiracy theorists think Moscow is launching airstrikes on Ukraine to destroy bioweapon-manufacturing labs in order to prevent the American infectious disease expert Anthony Fauci from creating a sequel to the COVID-19 virus." Justin Ling, *False Claims of U.S. Biowarfare Labs in Ukraine Grip QAnon*, Foreign Policy (Mar. 2, 2022), https://foreignpolicy.com/2022/03/02/ukraine-biolabs-conspiracy-theory-qanon/. The Department

---

[1]        Available at https://peteryim.substack.com/p/nih-fda-and-cdc-betrayed-the-country.

confronts such conspiracy theories every day. Garcia-Malene Decl. ¶ 19. Plainly, the specter of publicly becoming a subject of such fervent nonsense would chill Panel members from offering candid thoughts on a proposed Guidelines update.

This small sample of the threats, harassment, and conspiracy theories that the Department and those affiliated with it have experienced as a result of their efforts to fight COVID-19 illustrate how the chilling effect that disclosure would have on the Panel's deliberations is not speculative. If Panel members knew their views expressed during internal Panel deliberations could soon be released to the public, they would be more guarded in offering their true thoughts due to fears of harassment, violence, and unwanted hostile attention. Garcia-Malene Decl. ¶ 20; *see also Reps. Comm. for Freedom of the Press v. Customs & Border Prot.*, Civ. A. No. 18-0155 (TNM), 2021 WL 4843970, at *17, *19 (D.D.C. Oct. 18, 2021) ("[I]ndividuals associated with an unpopular agency action might be subject to public scrutiny and perhaps harassment. . . . CBP cites multiple instances where its employees have experienced harassment solely based on their employment with CBP. These instances include vandalism of multiple CBP vehicles, threats sent to Border Patrol agents by fax, and social media threats to douse CBP officers with acid. . . . the agency goes beyond that relatively generalized assertion and cites specific examples of harassment and threats against CBP employees . . . CBP has shown a risk of foreseeable harm." (citation omitted)).

This would impede the candid discussions and ventilation of scientific information, ideas, and analysis necessary to ensure the Guidelines reflect the most sound and current science on COVID-19. Garcia-Malene Decl. ¶ 20. Proposed Guidelines updates would undergo less rigorous scrutiny and vetting due to Panel members' fears that what they say during deliberations could soon be exposed to the public. *Id.*; *see also Reps. Comm.*, 3 F.4th at 372 ("[T]he sensitivity of the context in which these conversations arose as well as their subject matter, and the need for

confidentiality in [the] discussions . . . together provide the particularized context for a finding of foreseeable harm"); *Machado Amadis*, 971 F.3d at 371 (foreseeable harm shown where agency "specifically focused on the information at issue" and "concluded that disclosure of that information would chill future internal discussions" (quotation marks omitted)). This ultimately would result in less scientifically reliable COVID-19 guidance. Garcia-Malene Decl. ¶ 20; *see also Formaldehyde Inst.*, 889 F.2d at 1125 (disclosure would chill "the candor of potential reviewers of government-submitted articles" and thus "result in the publication of inferior work"). Degrading the Guidelines' reliability would in turn threaten the public health, as COVID-19 continues to rage across the country and the medical community continues to rely on the Guidelines to formulate COVID-19 treatment and management regimens. Garcia-Malene Decl. ¶ 21.

**B.    Production of the Minutes Would Enable Those Who Spread COVID-19-Related Misinformation to Misrepresent and Distort the Panel's Guidance**

Additionally, production of the minutes would enable those who spread COVID-19-related misinformation to distort and misrepresent the Panel's public health guidance, undermining the public's understanding of and confidence in the Guidelines. *See Reporters Comm.*, 3 F.4th at 361 (deliberative process privilege "guards against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." (quotation marks omitted)); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (same); *Jordan v. Dep't of Just.*, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (deliberative process privilege "protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon."). The government's interest in reducing "the risk of public confusion . . . has special force with respect to disclosures of . . . reasoning concerning proposed policies." *Petro. Info. Corp.*, 976 F.2d at 1437 n.10.

Since the pandemic began, a large volume of misinformation concerning safe, proper, and effective treatment and maintenance of COVID-19 has spread far and wide over various forms of media. Garcia-Malene Decl. ¶ 22. Such misinformation threatens the public health by encouraging its audience to reject sound health guidance and embrace untested, ineffective, or dangerous treatments, and eroding their ability to distinguish between reliable and unreliable health guidance. *Id.* Releasing the portions of the minutes concerning the Panel's deliberations over proposed Guidelines updates would create a risk of contributing to this torrent of misinformation by creating confusion as to what actually are the Panel's guidance and its reasons for offering it. *Id.*

This confusion often has involved the Guidelines and/or Panel. Garcia-Malene Decl. ¶ 23. To give one example, the Substack post discussed above falsely asserted that the Panel has never considered whether to recommend the drug Ivermectin for treating COVID-19, when in fact the Panel "determined that currently there are insufficient data to recommend either for or against the use of ivermectin for the treatment of COVID-19." *Id.* The Substack post asserted that the Panel's co-chairs exploited a "word-game loophole" to issue this guidance without the Panel's input. *Id.* The Panel's bylaws allow the co-chairs to update the Guidelines without a full panel vote when the change does not affect existing recommendations. *Id.* A reader may easily come away with the mistaken impression that the Panel's choice not to make a recommendation concerning Ivermectin's use to treat COVID-19 does not really have the Panel's imprimatur when it in fact does, and thus mistakenly conclude that Ivermectin is more reliable than it really is. *Id.*

Releasing the minutes of the Panel's deliberations over proposed Guidelines updates would enable dissemblers to misleadingly portray stray statements of individual Panel members out of context in a manner that undermines or conflicts with the full Panel's considered judgment. Garcia-Malene Decl. ¶ 24. This would undermine the public's confidence in and understanding of the

Guidelines, creating a risk that some will reject sound COVID-19 treatments and instead embrace unsound treatments, or simply be unable to distinguish between the two. *Id.* For that reason, it is important to the public health that NIH speak in one voice through the Guidelines that the Panel vets and approves, rather than through out-of-context statements of individual Panel members that do not necessarily reflect NIH's views. *Id.*; *see PEER v. Dep't of Homeland Sec.*, Civ. A. No. 18-0158 (CKK), 2021 WL 5987008, at *11 (D.D.C. Dec. 17, 2021) (foreseeable harm standard met where disclosure "may result in members of the public taking action on potential threats and hazards . . . in a manner not suggested by a recommendation contained in the documents" (quotation marks omitted)); *Amiri v. Nat'l Sci. Found.*, Civ. A. No. 20-02006 (TNM), 2021 WL 4438910, at *7 (D.D.C. Sept. 28, 2021) (foreseeable harm standard met where disclosure "would confuse the public and cast doubt on the public basis for [National Science Foundation's] grant decisions."); *Ctr. for Pub. Integrity v. Dep't of Def.*, 486 F. Supp. 3d 317, 337-38 (D.D.C. 2020) (foreseeable harm standard met where "disclosure could risk public confusion about which language was draft and which was the agency's final position").

## V.    The Department Produced All Reasonably Segregable, Non-Exempt Information

An agency must take reasonable steps to segregate and release all non-exempt portions of responsive records. 5 U.S.C. §§ 552(a)(8)(A)(ii)(I), 552(b). "Non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Evans*, 951 F.3d at 583 (quotation marks omitted). "Such an analysis . . . does not call for parsing [a record] line-by-line or segregating material dispersed throughout the document. Instead, the emphasis is on segregation of non-exempt material found in logically divisible sections." *Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Just.*, 844 F.3d 246, 257 (D.C. Cir. 2016) (cleaned up).

The Department carefully reviewed the responsive records it found on a page by page, line by line basis to identify any reasonably segregable, non-exempt information, and produced all such information to Wheatland. Garcia-Malene Decl. ¶ 25. Specifically, it produced information in four "logically divisible sections," *Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 257, of these records: (1) the header for each document; (2) the list of attendees and non-attendees at each meeting, along with their institutional affiliations, if any; (3) parts of meeting minutes that did not directly relate to proposed Guidelines updates; and (4) the concluding remarks at each meeting. Garcia-Malene Decl. ¶ 13. The only parts of the records the Department redacted were those that could not be further segregated without disclosing information that the deliberative process privilege protects. Garcia-Malene Decl. ¶ 25. These parts concerned Panel deliberations over proposed Guidelines updates, and so were "fully protected" under the deliberative process privilege. The Department thus satisfied its duty to release all non-exempt, reasonably segregable information. *See Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021) (agency met burden to show "it released all segregable portions of the responsive documents" by attesting that it "had conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information within responsive records," and "determined that no additional information may be released without divulging information that falls within the scope of one or more FOIA exemptions" (cleaned up)); *cf. Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 256 ("[B]ecause the entire record is exempt from disclosure [under the work product privilege], there are no non-exempt portions left to segregate").

## CONCLUSION

This Court should grant the Department summary judgment in full.

Dated: April 5, 2022                              Respectfully submitted,

                                                  MATTHEW M. GRAVES, D.C. Bar #481052
                                                  United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: /s/ _____
    BRADLEY G. SILVERMAN
    Assistant United States Attorney
    D.C. Bar #1531664
    555 Fourth Street NW
    Washington, DC 20530
    (202) 252-2675

*Attorneys for the United States*