UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAND WHEATLAND,<br><br>*Plaintiff*,<br><br>v.<br><br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES,<br><br>*Defendant*. | Civil Action No. 21-3126 (CJN) |

**DECLARATION OF GORKA GARCIA-MALENE**

I, Gorka Garcia-Malene, declare the following to be true and correct:

1. I am the Freedom of Information Act ("FOIA") Officer at the National Institutes of Health ("NIH"), U.S. Department of Health and Human Services ("HHS"). I have held this position with NIH since October 15, 2017. My duties include implementing FOIA policy across NIH and responding to requests for NIH records under the FOIA, 5 U.S.C. § 552, and other applicable records access provisions. These duties include managing searches for NIH records in response to FOIA requests, providing guidance to NIH record custodians or personnel regarding these searches, and determining whether to release or withhold records or portions of records in accordance with the FOIA and HHS regulations implementing the FOIA.

2. I make the statements herein on the basis of personal knowledge, as well as information acquired by me in the course of performing my official duties. In this capacity, I have become familiar with the background of this litigation, have reviewed all documents at issue in this litigation, and am familiar with the background of Plaintiff's FOIA request filed with NIH that is the subject of this litigation.

1

## **NIH COVID-19 Treatment Guidelines**

3.     NIH promulgated the COVID-19 Treatment Guidelines to provide health care providers, patients, and policy experts the most up to date information concerning the optimal treatment and management of COVID-19. Due to the rapid pace of developments in scientific understanding of COVID-19 and increasing volume of information on how best to treat and manage it, NIH updates the Guidelines frequently as new scientific data becomes available. The Guidelines can be found at https://www.covid19treatmentguidelines.nih.gov/. The medical community relies on the Guidelines to set COVID-19 treatment and management regiments.

4.     NIH has appointed the COVID-19 Treatment Guidelines Panel, a panel of experienced public health experts from federal agencies, health care and academic organizations, and professional societies, to develop the Guidelines. Panel members are selected based on their clinical experience and expertise in patient management, translational and clinical science, and/or development of treatment guidelines. Each Guidelines section is developed by a working group of Panel members with expertise in the area that section addresses. Each working group is responsible for identifying and conducting a systematic and comprehensive review of relevant scientific research, data, and literature, then synthesizing that data to develop recommendations. Each working group proposes updates based on the latest published researched findings and evolving clinical information concerning COVID-19. A full roster of panel members can be found at https://www.covid19treatmentguidelines.nih.gov/about-the-guidelines/panel-roster/.

5.     Voting Panel members review and vote on proposed updates to the Guidelines. Proposed updates generally amount to recommendations in favor of or against a treatment, or statements that no recommendation can be made given the insufficiency of evidence on a treatment. A majority of Panel members must support a proposed recommendation for it to be

incorporated into the Guidelines. In this way, all Guidelines recommendations are thoroughly vetted before they are adopted to ensure the public receives the best possible advice concerning the optimal management and treatment of COVID-19. Once the Panel adopts an update to the Guidelines, NIH incorporates that update into the Guidelines and publishes it on the Guidelines website.

6. During Panel meetings, Panel members express their thoughts, opinions, and recommendations concerning proposed Guideline updates. Panel members discuss whether proposed Guidelines updates merit adoption, and how updates should be written to maximize clarity and avoid unnecessary and potentially harmful confusion. Panel members frequently expressed their thoughts in preliminary form, revising and changing them as deliberations progressed in response to fellow Panel members' comments.

7. The Panel's internal discussions are an important aspect of the process by which NIH formulates the Guidelines. They ensure that the scientific information and analysis underlying proposed Guidelines updates is subject to careful scrutiny by experts and determined to be reliable. When Panel members offer differing perspectives on a proposed update, dialogue between them ensures that their perspectives are fulsomely ventilated, so the Panel can determine which is more compelling. This enables NIH to update the Guidelines based on the most sound scientific analysis available. To protect the integrity of this process, Panel members are required to keep confidential any discussions that occur and information presented during Panel meetings.

8. The Panel's Executive Secretary is Dr. Alice K. Pau, PharmD, a Staff Scientist and Clinical Pharmacist at the National Institute of Allergy and Infectious Diseases ("NIAID") a subsidiary agency within NIH. Dr. Pau serves as the Panel's Executive Secretary in the course of her official duties as an HHS employee. In her role as Executive Secretary, Dr. Pau takes

minutes for each Panel meeting and stores them in her files within NIH's file system. The minutes reflect her subjective assessments as to which aspects of the Panel's deliberations she considered most important to the Guidelines' formulation. NIH expected the Panel to keep minutes of its meetings, and intended that those minutes would remain confidential.

9. Panel members are expected to offer their thoughts and opinions on proposed updates based solely on their impartial expertise and consideration of public health. They are expected not to act as advocates for, or in a manner that aims to benefit, any particular company, entity, or private interest. Panel members are expected to recuse themselves from matters where they may have a conflict of interest, and the Panel publishes a list disclosing those companies related to COVID-19 diagnostics or treatment with whom Panel members have a relationship.

### FOIA Request 55825

10. On January 29, 2021, Rand Wheatland submitted a FOIA request to NIH, later assigned tracking number 55825, seeking records related to transcripts, minutes and recordings of the meeting of the NIH COVID-19 Treatment Guidelines Panel from 2020 and 2021.

11. On January 29, 2021, NIH and it subsidiary, the National Institute of Allergy and Infectious Diseases, ("NIAID") conducted a search for records responsive to FOIA request 55825. Dr. Pau, the Panel's Executive Secretary, searched the digital file where she saves the minutes of Panel meetings after each meeting. This search turned up 158 pages of minutes from the Panel's 41 meetings. Each responsive record was titled "meeting notes." Dr. Pau knew where the meeting minutes would be saved, because she is the one who both created and stored the minutes, and confirmed that no recordings or transcripts of the Panel's meetings were ever created. Given her role on the Panel, that is something she was in a position to know. No

additional search was needed, as she knew there were no other places where Panel meetings minutes would be.

12. On March 5, 2021, NIH sent Wheatland a final response letter withholding all 158 pages of responsive records in their entirety pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5), under the deliberative process privilege.

13. On March 31, 2022, NIH produced 158 pages of responsive records with redactions. Unredacted portions of these records fall into four categories: (1) the header for each document reflecting the minutes of a particular meeting, which says "Panel on Guidelines for Management of COVID-19 – Meeting Notes" and identifies the date and time of the meeting; (2) the list of attendees and non-attendees at each meeting, which includes Panel members, community members, representatives of professional organizations, ex-officio members, other guests, and support staff, as well as their institutional affiliations, if any; (3) the portions of the minutes covering the beginning of the meeting in which the Panel discussed matters not directly related to proposed Guidelines updates, such as introductions for guests and web metrics for the Guidelines website; and (4) concluding remarks for each meeting, during which the Executive Secretary typically thanked attendees for their efforts. Redacted portions of these records pertain to the Panel's deliberations over proposed Guidelines updates and the scientific data, analysis, and ideas underlying them.

### HHS's Reasons for Withholding Records

14. The Panel's internal deliberations over proposed Guidelines updates are a critical aspect of the process by which NIH provides guidance to the public concerning the optimal treatment and management of COVID-19.

15. Since the COVID-19 public health emergency began, HHS employees, especially those at NIH, have frequently been targets of harassment and threats by members of the public upset over aspects of the government's response to the pandemic, including threats of bodily harm and death. They have also frequently been the targets of hostile misinformation and conspiracy theories on the internet.

16. Dr. Anthony Fauci, Director of NIAID and one of the most prominent public officials involved with the government's response to COVID-19, has received threats of death and bodily harm on a near-daily basis since the pandemic began. The following are just a few of the many threatening and harassing messages he received over a single three-day period:

- You stupid motherfucker! Do you not know that we see who u work for !! Of course u want to push vaccines! You work for Bill Gates!! And let me say this u toad!!! BILL is going to be gone , very very soon! All you pedophiles are going to be brought to justice ! And u Tony ! We going to ruin your life ! N****r[1] you have about 5 days! 5 motherfucker! Or you will be took out! Now mark my words goofy

- I would encourage you to slit your wrists. But you won't and therefore you will experience even greater pain. Good.

- Fauci. You are nobody. American people already fired you. Orangutrump should fire you too. You mother fucker prevented me and otherS to be tested for cv. Orangutrump fascist needed his Italian Mengele to euthanize by Covid.

- Bitch, you gonna know pain.

17. While Dr. Fauci's prominence has resulted in a higher volume of threats and harassment directed his way than most HHS officials experience, other employees, especially those who work at NIH, the Centers for Disease Control ("CDC"), and the Food and Drug Administration ("FDA") have frequently been the targets of behavior that is similar in kind.

---

[1] The original version of this message did not include asterisks.

Individual Panel members likewise have received threats and harassing messages pertaining to their participation in NIH's efforts to combat COVID-19.

18.     Beyond outright threats of death or bodily harm, HHS and its subsidiary agencies have also frequently been targets of hostile conspiracies and misinformation on the internet. For example, on January 17, 2022, a user of the popular blogging platform Substack named Peter Yim, who styles himself a commentator "on COVID-19 science and policy" and claims to have held a research appointment at NIH, published a post titled "NIH, FDA and CDC betrayed the country: The sophisticated campaign of disinformation against the American people." Available at https://peteryim.substack.com/p/nih-fda-and-cdc-betrayed-the-country. There, he described those agencies as "a public menace" that "have betrayed their country," "conducted campaigns of disinformation against the people," and committed "a crime against humanity." One reader commented, "It can even be said NIH, FDA and CDC betrayed the humanity." Such hostile, menacing sentiments make it reasonably foreseeable that Panel members would refrain from speaking with full candor if they knew minutes of their deliberations could soon be made public.

19.     Other conspiracy theories involving HHS's role in combatting COVID-19 are even more extravagant, but no less insidious. Just earlier this month, it was reported earlier this month that "[p]ro-Russian channels and QAnon conspiracy theorists think Moscow is launching airstrikes on Ukraine to destroy bioweapon-manufacturing labs in order to prevent the American infectious disease expert Anthony Fauci from creating a sequel to the COVID-19 virus." Justin Ling, *False Claims of U.S. Biowarfare Labs in Ukraine Grip QAnon*, Foreign Policy (Mar. 2, 2022), https://foreignpolicy.com/2022/03/02/ukraine-biolabs-conspiracy-theory-qanon/. This is representative of the conspiracy theories that HHS confronts every day.

20. If Panel members knew that the viewpoints they voice during internal Panel deliberations could soon be released to the public, they would be more guarded in offering their true thoughts due to fears of harassment, violence, and unwanted hostile attention. This would impede the candid discussions and ventilation of scientific information, ideas, and analysis necessary to ensure that the Guidelines reflect the most sound and current science on COVID-19. Proposed Guidelines updates would undergo less rigorous scrutiny and vetting due to Panel members' fears that what they say during Panel deliberations could soon be exposed to the public. This ultimately would result in less scientifically reliable guidance concerning management and treatment of COVID-19.

21. COVID-19 continues to rage across the United States. Because the medical community relies on the Guidelines to set COVID-19 treatment and management regimens, degrading the Guidelines' scientific reliability would threaten the public health.

22. Revealing the Panel's internal deliberations also would enable those who spread misinformation concerning COVID-19 to misrepresent and distort the Panel's public health guidance. Since the pandemic began, a large volume of misinformation concerning safe, proper, and effective treatment and maintenance of COVID-19 has spread far and wide over various forms of media. Such misinformation threatens the public health by encouraging its audience to reject sound health guidance and embrace untested, ineffective, or dangerous treatments, and eroding their ability to distinguish between reliable and unreliable health guidance. Releasing the Panel's minutes would create a risk of contributing to this torrent of misinformation by creating confusion as to what the Panel's guidance and its reasons for offering it actually are.

23. COVID-19-related misinformation often involves the Guidelines or the Panel. For example, the Substack post discussed above falsely asserted that the Panel has not considered

whether to recommend the drug Ivermectin to treat COVID-19, when in fact it has "determined that currently there are insufficient data to recommend either for or against the use of ivermectin for the treatment of COVID-19." COVID-19 Treatment Guidelines Panel, *The COVID-19 Treatment Guidelines Panel's Statement on the Use of Ivermectin for the Treatment of COVID-19* (Jan. 14, 2021), https://files.covid19treatmentguidelines.nih.gov/guidelines/archive/statement-on-ivermectin-01-14-2021.pdf. The Substack post asserted that the Panel's co-chairs relied on a "word-game loophole" to issue this Guidance without the full Panel's consideration. That is a misleading characterization as the Panel's pre-existing bylaws expressly authorized the co-chairs to update the Guidelines without a full panel vote when the change does not affect existing recommendations. But more importantly, the Substack post suggests the Panel has not addressed Ivermectin's use to treat COVID-19, when in fact it has through its ordinary processes expressly declined to make a recommendation on Ivermectin either way due. A person reading the post might easily take away the impression that the Panel did not really decline to make a recommendation on Ivermectin, and thus that Ivermectin is more reliable than it really is.

24.     Releasing the minutes of the Panel's deliberations over proposed Guidelines updates would enable dissemblers to misleadingly portray statements of individual Panel members out of context in a manner that conflicts with or undermines the full Panel's considered judgment. This would undermine public confidence in and understanding of the Guidelines, creating a risk that those who hear it will reject sound COVID-19 treatments and instead embrace unsound treatments, or else simply be unable to distinguish between the two. For that reason, it is important to the public health that NIH speak in one voice through the Guidelines that the Panel vets and approves, rather than through out-of-context statements of individual Panel that do not necessarily reflect those of NIH.

9

25. NIH carefully reviewed the responsive records it found on a page by page, line by line basis to identify any reasonably segregable, non-exempt information, and produced such information to Wheatland. The only information NIH redacted could not be further segregated without disclosing information that the deliberative process privilege protects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Gorka Garcia-Malene

Executed this 5th day of April 2022