UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAND WHEATLAND,<br><br>*Plaintiff*,<br><br>v.<br><br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES,<br><br>*Defendants*. | Civil Action No. 21-3126 (CJN) |

## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Department of Health and Human Services, by and through the undersigned counsel, respectfully files this combined reply in support of its motion for summary judgment, ECF No. 11, and response to Plaintiff Rand Wheatland's cross-motion for summary judgment, ECF No. 14, in this case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## ARGUMENT

Wheatland submitted a FOIA request for "all of the transcripts, minutes and recordings of the meetings of the" National Institutes of Health ("NIH") "COVID-19 Treatment Guidelines Panel from 2020 and 2021. Pl.'s Resp'n, Ex. A, FOIA Request, ECF No. 14-1. In moving for summary judgment, the Department explained that it performed an adequate search for responsive records; properly invoked Exemption 5, based on the deliberative process privilege, to redact parts of the records the release of which foreseeably would harm interests that the privilege protects; and released all reasonably segregable, non-exempt parts of the records. In response, Wheatland offers no meritorious responses to any of these points. For these reasons, this Court should grant the Department summary judgment and deny Wheatland's cross-motion for summary judgment.

I.      **The Department Performed An Adequate Search For Responsive Records**

In moving for summary judgment, the Department explained that it performed an adequate search for records responsive to Wheatland's FOIA request. Def.'s Mem. at 6-9, ECF No. 11-1. Wheatland challenges this search's adequacy on three bases, arguing that the Department (1) might have additional responsive records, (2) did not search for records pertaining to Panel members' recusals, and (3) mischaracterized the scope of his request. Each of these arguments is meritless.

First, Wheatland argues that "there may have been any other forms of agency minutes or notes or meeting records of the panel proceedings, in addition to those which were prepared and located by Dr. [Alice K.] Pau." Pl.'s Resp'n at 13, ECF No. 13-1. But "mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search." *Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013) (cleaned up). Rather, an agency is obliged to search for responsive records only in places it has reason to believe are "likely" to contain them. *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999). An agency need not search additional record systems beyond those it has already searched so long as it explains, in reasonable detail, "that no other record system was likely to produce responsive documents." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

Wheatland's claim that "there may have been" other responsive records beyond those Dr. Pau prepared or found, Pl.'s Resp'n at 13, is wholly speculative. Dr. Pau, as the Panel's Executive Secretary, is the one who took the "minutes for each Panel meeting and store[d] them in her files." Decl. of Gorka Garcia-Malene ¶ 8, ECF No. 11-3. She "knew where the meeting minutes would be saved, because she is the one who both created and stored them," and also that "there were no other places where Panel meeting minutes would be." Garcia-Malene Decl. ¶ 11. "Given her role on the Panel, that is something she was in a position to know." *Id.* For these reasons, Wheatland's

claim that there may have been other responsive records is precisely the sort of "mere speculation" that does not undermine the adequacy of the Department's search. *Hodge*, 703 F.3d at 580.

Second, Wheatland argues that the Department did not search for "any meeting notes or responsive records pertaining to any panel recusal actions for any of the applicable COVID-19 panel meetings." Pl.'s Resp'n at 13-14. To the extent any such materials are found in the Panel's meeting minutes, the Department did search for them, as already explained. Garcia-Malene Decl. ¶ 11; Def.'s Mem. at 7. And to the extent Wheatland is referring to records beyond the "transcripts, minutes, and recordings of the [Panel's] meetings" themselves, he never sought them in his FOIA request, so the Department had no obligation to search for them. *See* FOIA Request; *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996) (agency need not search for records "beyond the four corners of the request"); *Archibald v. Dep't of Just.*, 950 F. Supp. 2d 80, 85 (D.D.C. 2013) ("Because the plaintiff's original request did not request the production of [certain] records, and because he did not subsequently request that he be provided any [such] records, the FBI did not conduct a search for such records"); *Negley v. FBI*, 766 F. Supp. 2d 190, 195 (D.D.C. 2011) ("an agency is not required to search for records which are beyond the scope of the original request").

Third, Wheatland claims that the Department "fabricated" the "false" claim that his request sought not just the records described above, but also any records "related to" them, "apparently for the sole purpose of misleading the court." Pl.'s Resp'n at 13. Wheatland misunderstands what the Department said. The Department did not say that his request sought any records "related to" those that his request described—only that his request would be overbroad "to the extent that" it sought such records. Def.'s Mem. at 8. The Department had good reason to think Wheatland was seeking records "related to" those that his request described, because his own complaint repeatedly said that he was. *See* Compl. ¶¶ 1, 13, ECF No. 1 (twice asserting that Wheatland "seek[s] HHS

3

records related to transcripts, minutes and recordings of the meetings of the NIH COVID-19 Treatment Guidelines Panel from 2020 and 2021"). In any event, by arguing that he did not actually request these records, Wheatland appears to disclaim any demand for them.

For all of these reasons, this Court should grant the Department summary judgment as to the adequacy of its search.

## II.     Exemption 5 Applied To The Records Based On The Deliberative Process Privilege

In moving for summary judgment, the Department explained that it had properly relied on Exemption 5 to redact the records at issue based on the deliberative process privilege. Def.'s Mem. at 9-15. It offered two distinct justifications for invoking the privilege here—that the records are privileged both (1) as Dr. Pau's deliberative notes created within the scope of her official duties, *id.* at 12, and (2) under the consultant corollary doctrine, *id.* at 13, which provides that the privilege reaches "communications between Government agencies and outside consultants hired by them," *Dep't of Int. v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 10 (2001). As to the first of these rationales, the Department explained that the records are privileged because they reflect Dr. Pau's "subjective assessments as to which aspects of the Panel's deliberations she considered most important to NIH's issuance of the Guidelines." Def.'s Mem. at 13; *see also Baker Hostetler LLP v. Dep't of Com.*, 473 F.3d 312, 321 (D.C. Cir. 2006) ("[N]otes taken by government officials often fall within the deliberative process privilege. Notes generally are selective and deliberative— and routine public disclosure of meeting notes and other notes would hinder government officials from debating issues internally, deter them from giving candid advice, and lower the overall quality of the government decisionmaking process." (citation omitted)); *Touarsi v. Dep't of Just.*, 78 F. Supp. 3d 332, 346 (D.D.C. 2015) ("An individual government officer's notes may constitute deliberative documents if they are used to assist the decisionmaking process.").

4

Wheatland addresses only the Department's second rationale for invoking the privilege—that the consultant corollary doctrine applies—offering no response to its explanation that the records are privileged because they are Dr. Pau's deliberative notes even without the consultant corollary doctrine. By failing to respond in any way to this point, Wheatland has conceded it. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded"); *Reyes v. EPA*, 991 F. Supp. 2d 20, 24 n.2 (D.D.C. 2014) ("It is well established that if a [party] fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded."). Nor can Wheatland belatedly address this point in his cross-reply, as "[a] party forfeits an argument by failing to raise it in his opening brief." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). On this basis alone, this Court should grant the Department summary judgment as to Exemption 5's applicability, and need not reach whether the consultant corollary doctrine applies. *Cf. Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) ("When an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed.").

In any event, the consultant corollary doctrine applies here. As the Department explained, it appointed the Panel to aid it in developing the Guidelines. Garcia-Malene Decl. ¶ 4. To be sure, the consultant corollary doctrine does not apply if the "object of the [consultant's] communications is a decision by an agency of the Government to support a claim by the [consultant] that is necessarily adverse to the interests of competitors." *Klamath*, 532 U.S. at 10. But Wheatland does not even argue, much less show, that the Panel's work meets this description, and nothing in the record suggests it does. The Panel does not dole out a limited supply of rivalrous benefits between

competing claimants, as was the case in *Klamath*—it promulgates generally applicable guidance concerning proper treatment and maintenance of COVID-19. Garcia-Malene Decl. ¶ 4. Its work has no discernable distributive effect at all. Wheatland does not argue, and nothing in the record suggests, that Panel members press claims during Panel deliberations that are necessarily adverse to their competitors' interests. The exception to the consultant corollary doctrine that *Klamath* identified thus does not apply here.

      Wheatland's argument appears to be that the consultant corollary doctrine does not apply because Panel members have interests in the Panel's work. But the D.C. Circuit has held that the doctrine may apply even if an entity "has a distinct and independent interest" in the subject of its communication with an agency—even an interest so strong as to make it effectively the agency's "adversary rather than a consultant." *Pub. Citizen v. Dep't of Just.*, 111 F.3d 168, 171 (D.C. Cir. 1997); *see also Ryan v. Dep't of Just.*, 617 F.2d 781, 791 (D.C. Cir. 1980) (doctrine applied to records that expressed consultant's "personal views"); *Formaldehyde Inst. v. Dep;t of Health & Human Servs.*, 889 F.2d 1118, 1124-25 (D.C. Cir. 1989) (doctrine covered comments that a journal made in deciding whether to publish article that federal employees submitted, which helped agency decide where and in what form to publish article, even though the comments served journal's own interests); *Am. Oversight v. Dep't of Treasury*, 474 F. Supp. 3d 251, 267 (D.D.C. 2020) ("a consultant and an agency may share common goals such that, even if the consultant appears to be acting to foster its own interests, its actions might also be construed as aiding an agency process." (quoting *Jud. Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 112 (D.D.C. 2018))).

      *Klamath* itself recognized that the consultant corollary doctrine may apply even where a consultant has an interest in the subject of its communication with an agency. It explained that a consultant need not "be devoid of a definite point of view when the agency contracts for its

6

services," and that "the dispositive point" is simply whether a communication between a consultant and agency is about the agency's decision "to support a claim" by the consultant "that is necessarily adverse to the interests of competitors." 532 U.S. at 10. And it expressly declined to disturb *Public Citizen* and *Ryan*, leaving these decisions as good law. *Id.* at 13 n.4 (characterizing consultants in *Public Citizen* as having "their own, independent interests" and in *Ryan* as having "strong personal views on the matter"); *see also United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) ("This Court's prior decisions bind the circuit unless and until overturned by the court en banc or by Higher Authority." (quotation marks omitted)). The bare fact that Panel members may have had interests in the Panel's work thus does not preclude the consultant corollary doctrine's application.

But even if the consultant corollary doctrine does not apply where a consultant has a mere interest in the matter at hand, Wheatland's claim that Panel members had interests in the Panel's work is too speculative to credit. An agency shows that an exemption applies by "demonstrating the basis for withholding" if its evidence is "not contradicted by contrary evidence in the record." *Reporters Comm. for Freedom of Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021). When an agency adduces evidence that an exemption applies, a plaintiff cannot show otherwise through speculative or conclusory allegations. *See Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 375 (D.C. Cir. 2020) ("an affidavit lacking specific facts or support from the record is, by itself, insufficient to create a genuine factual issue."); *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 470 (D.C. Cir. 2014) ("a vague and conclusory statement is inadequate to support summary judgment" (quotation marks omitted)); *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999) ("conclusory allegations unsupported by factual data will not create a triable issue of fact" (cleaned up)).

All Wheatland offers for his assertion that Panel members had interests in the Panel's work is a list of organizations that supposedly lobby Congress and federal agencies on certain COVID-

7

19-related issues, which he claims Panel members represent. *Id.* at 8. But he fails to specify which particular issues these entities supposedly lobby the government to address, much less how the Panel's work implicates such issues. Without this information, it is impossible to conclude that these entities have interests in the Panel's work. And while Wheatland alleges that Panel members "actively lobby and advocate for their organizations' positions on the medical and scientific issues" that the Panel discusses, *id.* at 6, he offers no evidence whatsoever for this baseless innuendo. In sum, Wheatland's claim is that Panel members represent entities with unspecified interests that the Panel's work implicates in unspecified ways. This bald allegation is too speculative and conclusory to create a genuine issue of fact as to whether the consultant corollary doctrine applies.

Finally, Wheatland seems to conflate the Department's positions that its redactions satisfy (1) FOIA's foreseeable harm standard, *see* 5 U.S.C. § 552(a)(8)(A)(i)(I), and (2) the deliberative process privilege. The Department did not argue that the privilege applies merely because its redactions meet the foreseeable harm standard. Rather, whether (1) an exemption applies and (2) a redaction satisfies the foreseeable harm standard are separate inquiries, both of which an agency must meet to justify the redaction. *See Reporters Comm.*, 3 F.4th at 361 ("To carry its burden at summary judgment, the government must demonstrate that (A) the materials at issue are covered by the deliberative process privilege, and (B) it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege.").

For all of these reasons, this Court should grant the Department summary judgment as to its invocation of Exemption 5 based on the deliberative process privilege.

**III.     The Department Satisfied The Foreseeable Harm Standard**

In moving for summary judgment, the Department explained that disclosing the records at issue would cause foreseeable harm in two ways: by (1) chilling Panel members from sharing their

8

candid views during Panel deliberations, and (2) facilitating COVID-19-related misinformation's spread. Def.'s Mem. at 15-21. In response, Wheatland does not dispute, and so concedes, that the Department has demonstrated the reasonably foreseeable harm Section 552(a)(8)(A)(i)(I) requires. *See Wannall*, 775 F.3d at 428. While he argues that disclosure would not cause certain harms, he does so only in the course of arguing that the deliberative process privilege does not apply—he does not argue that the Department fails to meet the foreseeable harm standard. Pl.'s Resp'n at 8-10. As explained above, these are entirely separate requirements, reflected in separate sections of 5 U.S.C. § 552. Nor is there any reason to construe Wheatland's response brief to address the foreseeable harm standard based on arguments that he made concerning the deliberative process privilege. By failing to address the foreseeable harm standard, Wheatland waives the issue.

Even construing Wheatland's response to address the foreseeable harm standard based on arguments he made concerning the deliberative process privilege, Wheatland's arguments still fail. First, he appears to think that the Department claims disclosure "would somehow lead to increased threats to government officials." Pl.'s Resp'n at 9. That is not the Department's position. What the Department said is that disclosure would chill Panel members from offering their candid views during Panel deliberations due to fear that what they say would become public. Def.'s Mem. at 16-19. The Department has explained that since the pandemic began, lurid and fantastical conspiracy theories involving public health officials have spread, and public health officials have faced a deluge of hostile and threatening messages. *Id.* at 16-18. It further explained that if Panel members knew that what they say during Panel deliberations would become public, the fear of being on the receiving end of these messages would chill them from speaking candidly. *Id.* at 18-19. Wheatland does not dispute any of these points. The Department then explained that the chilling effect that disclosure would have satisfies the foreseeable harm standard. Wheatland does not dispute that,

9

either. Even if disclosure does not increase the number of hostile or threatening messages public health officials face, fear of being subject to such messages would chill Panel members from speaking candidly. Wheatland fails to address and so concedes this. *See Wannall*, 775 F.3d at 428.

Second, the Department explained that disclosure would facilitate the spread of COVID-19-related misinformation by "enabl[ing] dissemblers to misleadingly portray stray statements of individual Panel members out of context in a manner that undermines or conflicts with the full Panel's considered judgment." Def.'s Mem. at 20. Wheatland argues that there is no evidence that this would happen, but the Department already has shown that large volumes of COVID-19-related misinformation—including misinformation relating to the Guidelines—have propagated since the pandemic began. Garcia-Malene Decl. ¶¶ 22-24. It is reasonably foreseeable that disclosing the Panel's pre-decisional deliberations, in which Panel members express views that do not necessarily reflect the full Panel's considered final judgment, and which can be shorn of context or presented as the Panel's own views, Garcia-Malene Decl. ¶ 24, would contribute to misinformation's spread. Indeed, at least one Substack writer has already portrayed the Panel's work in a misleading fashion to claim that the Panel has never considered whether to recommend the drug Ivermectin for treating COVID-19, when in fact the Panel has determined that insufficient data exists to recommend for or against taking Ivermectin to treat COVID-19. Garcia-Malene Decl. ¶ 23.

Such misinformation cannot be assumed harmless—the Department reasonably foresees that it "threatens the public health by encouraging its audience to reject sound health guidance and embrace untested, ineffective, or dangerous treatments, and eroding their ability to distinguish between reliable and unreliable health guidance." Garcia-Malene Decl. ¶ 22. Disclosing statements Panel members made during Panel deliberations, which can be removed from context or portrayed as the full Panel's views, would "undermine the public's confidence in and understanding of the

Guidelines, creating a risk that some will reject sound COVID-19 treatments and instead embrace unsound treatments, or simply be unable to distinguish between the two." Def.'s Mem. at 20-21.

For these reasons, this Court should grant the Department summary judgment as to the foreseeable harm standard.

### IV.     The Department Produced All Reasonably Segregable, Non-Exempt Information

Finally, the Department has shown that it produced all reasonably segregable, non-exempt information. Non-exempt information is not reasonably segregable, and thus need not be produced, if it is "inextricably intertwined with exempt portions." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 583 (quotation marks omitted). An agency's segregability analysis "does not call for parsing [a record] line-by-line or segregating material dispersed throughout the document. Instead, the emphasis is on segregation of non-exempt material found in logically divisible sections." *Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Just.*, 844 F.3d 246, 257 (D.C. Cir. 2016) (cleaned up).

The Department met its segregability burden by producing information contained in four logically divisible sections of the Panel's meeting minutes—the (1) header for each document; (2) list of attendees and non-attendees at each meeting, along with their institutional affiliations, if any; (3) parts of meeting minutes that did not directly relate to proposed Guidelines updates; and (4) concluding remarks at each meeting. Garcia-Malene Decl. ¶ 13. The only parts of these records that the Department redacted were those concerning Panel deliberations over proposed Guidelines updates, which could not be further segregated without disclosing information that the deliberative process privilege protects. Garcia-Malene Decl. ¶ 25.

Wheatland raises two challenges to the Department's segregability analysis, but neither has merit. First, he contends that the Department's explanation of its segregability analysis was "very generalized" Pl.'s Resp'n at 11. But the Department explained that the redacted parts of the records

11

pertain to Panel "deliberations over proposed Guidelines updates and the scientific data, analysis, and ideas underlying them." Garcia-Malene Decl. ¶ 13. These materials are entirely exempt from disclosure as the deliberative process privilege covers them in their entirety, and the Department reasonably foresees that their release would cause the harms described in Part III above. *See Nat'l Ass'n of Crim. Def. Lawyers*, 844 F.3d at 256 ("because the entire record is exempt from disclosure [as attorney work product], there are no non-exempt portions left to segregate").

Moreover, the Department has explained that it "carefully reviewed the responsive records it found on a page by page, line by line basis to identify any reasonably segregable, non-exempt information, and produced such information to Wheatland," withholding only those records that "could not be further segregated without disclosing information that the deliberative process privilege protects." Garcia-Malene Decl. ¶ 25. Such an attestation satisfies the Department's duty to release reasonably segregable, non-exempt information. *See Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021) (agency met burden to show "it released all segregable portions of the responsive documents" by attesting it "had conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information within responsive records," and "determined that no additional information may be released without divulging information that falls within the scope of one or more FOIA exemptions" (cleaned up)).

Second, Wheatland complains that the Department's records productions "failed to provide virtually any information as to even the general subject matters and issues that were discussed in the panel proceedings." Pl.'s Resp'n at 11. But that is because, as already explained, the contents of these discussions is precisely what the deliberative process privilege protects, and its disclosure is what the Department reasonably foresees would cause the harms described in Part III. Wheatland cites no authority, and the Department knows of none, for the claim that the amount of information

an agency produces has any bearing on whether it has performed a proper segregability analysis. *Cf. In re Clinton*, 970 F.3d 357, 368 (D.C. Cir. 2020) ("the reasonableness of a FOIA search does not turn on whether it actually uncovered every document extant, and that the failure of an agency to turn up a specific document does not alone render a search inadequate" (cleaned up)).

For these reasons, this Court should grant the Department summary judgment as to the issue of segregability.

## CONCLUSION

This Court should grant the Department summary judgment in full, deny Wheatland's cross-motion for summary judgment, and enter judgment for the Department.

Dated: June 28, 2022

Respectfully submitted,

MATTHEW M. GRAVES
D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/
BRADLEY G. SILVERMAN
D.C. Bar #1531664
Assistant United States Attorney
601 D Street NW
Washington, DC 20530
(202) 252-2675
bradley.silverman@usdoj.gov

*Attorneys for the United States*